## Texas Eastern Transmission Corporation v. Rankin et al.

*Joseph W. Ray, Jr.*, *H. Ober Hess* and *Charles I. Thompson*, for complainant.

*C. W. Martin*, for respondents.

CARR, P. J., August 31, 1951.—Texas Eastern Transmission Corporation, the owner and operator of an interstate pipe line system extending from the natural gas fields of Texas and Louisiana across Arkansas, Missouri, Illinois, Indiana, Ohio, West Virginia, and Pennsylvania to terminal stations in New Jersey and New York, brings this bill to restrain the county commissioners from collecting a tax assessed upon that portion of the system that lies within the borders of this county on the ground, among others, that it is a quasi-public corporation and therefore not subject to any local real estate tax. The material facts of the case appear by stipulation.

### Findings of Fact

1. Texas Eastern Transmission Corporation, plaintiff, is a Delaware corporation engaged in the business of transporting and selling natural gas in interstate commerce for ultimate distribution to the public, and as such is duly registered in Pennsylvania. It owns and operates in this State two parallel pipe lines 30 and 24 inches in diameter respectively, and known as "The Big Inch" and "Little Big Inch," both laid below plow depth in continuous rights of way over private property across the southern tier of counties

to the Delaware River, of which 30.3 miles are in Fayette County, 7.51 miles being in Dunbar Township, 5.23 miles in German Township, 0.65 miles in Luzerne Township, 3.99 miles in Menallen Township, 6.65 miles in North Union Township, and 6.27 miles in Springfield Township. In addition it owns and operates a pumping station in North Union Township.

2. The pipeline system, including assignable rights of way, was originally owned by Defense Plant Corporation, having been constructed by it as a war measure during World War II, "The Big Inch" to transport crude oil from Texas fields to refineries on the eastern seaboard, and "The Little Big Inch" aviation gasoline and other petroleum products from Gulf Coast refineries to New York harbor; but pursuant to a joint resolution of Congress approved June 30, 1945, Public Law 10, 79th Congress, 15 U. S. C. §611 note, the property was transferred as of July 1, 1945, to Reconstruction Finance Corporation, both corporations being instrumentalities of the United States, and when hostilities ceased was declared surplus war property and sold to plaintiff for the interstate transportation of natural gas, reserving, however, to the United States for a period of 20 years the right to reclaim it in the interest of National defense.

3. The business of plaintiff is regulated under the provisions of the Natural Gas Act of June 21, 1938, c. 556, 52 Stat. at L. 821, 15 U. S. C. §717, solely by the Federal Power Commission, from which it has obtained a certificate of public convenience and necessity authorizing and requiring it to sell and deliver natural gas to public utilities in Pennsylvania and other States for resale to the public. The utilities to which deliveries are made and the rates charged are all prescribed by that commission. Its sales in 1949 to utilities in Pennsylvania amounted to 94,501,268,-000 cubic feet, which was more than half of the natural

gas consumed in this State during that year. On November 1, 1950, it began to sell natural gas to Manufacturers Light and Heat Company for resale to consumers in Fayette County, and during the six months ending April 1, 1951, furnished to that company 1,531,-488,000 cubic feet.

4. For the year 1949 plaintiff paid to the Commonwealth of Pennsylvania a franchise tax of $19,456.80, and a corporate net income tax of $27,640.70; and for 1950 a franchise tax of $22,877.10, and a corporate net income tax of $46,001.44.

5. On August 29, 1949, for the year 1950, the Board of Assessment and Revision of Taxes of this county, acting pursuant to the Fourth to Eighth Class County Assessment Law of May 21, 1943, P. L. 571, 72 PS §5453.101, et seq., assessed as real estate that portion of plaintiff's pipeline system which is situated within the county at a valuation of $1.75 per foot, or $9,-240.00 per mile, a total valuation for county purposes of $279,972.00.

*Discussion*

The time-honored policy of this State with respect to the taxation of quasi-public corporations was plainly stated in Conoy Township Supervisors v. York Haven Electric Power Plant Company, 222 Pa. 319, as follows:

"It has been uniformly held in Pennsylvania, that the real estate of a public, or quasi public, corporation, essential to the exercise of its corporate franchises is not subject to local taxation in the absence of legislative authority imposing such taxes. The power to tax necessarily includes the power to sell for nonpayment of taxes, and thus the property of a public corporation, without which it could not perform its duties to the public, could be sold piecemeal and the corporate purpose be defeated by divesting the title to certain por-

tions of the real estate against which tax liens were filed. Again, many quasi public corporations extend into and through different municipalities, and as a question of public policy, it has not been deemed wise to subject them to the exactions of the taxing officer at every municipal division line, but rather to authorize the Commonwealth to impose a capital stock tax upon such corporations, and in appraising the same for the purpose of taxation, the real estate, franchises, earning power, dividends and all other matters which affect the value thereof, must be taken into consideration. In this manner the real estate of a quasi public corporation is taxed, and while the tax goes directly to the state in the first instance, cities, boroughs, townships, school districts and other municipal divisions receive the benefits of such taxation by appropriations made to the public schools, to hospitals, to eleemosynary institutions and to charities of different kinds located throughout the state."

Although as to foreign corporations the capital stock tax has been replaced by a franchise tax, the formula used in measuring the tax includes as one of its factors the proportionate value of all tangible property situated within the Commonwealth: Act of March 24, 1949, P. L. 358, sec. 1, 72 PS §1871. The franchise tax was obviously devised to reach the property of foreign corporations as the equivalent of the capital stock tax: Murray et ux. v. City of Philadelphia et al., 364 Pa. 157, 170; Arrott's Estate, 322 Pa. 367.

Thus, since the immunity from local real estate taxation accorded in this State to quasi-public corporations does not constitute an exemption from all taxation, it does not violate article IX, sec. 2, of the Constitution of the State: Turco Paint & Varnish Company v Kalodner et al., 320 Pa. 421, 432. Nor does the recognition of the special status of such corporations violate section 1 of that article as establishing an

arbitrary or unreasonable classification. They have many obvious points of distinction from other businesses, including their inability to pass on their taxes in higher prices to the public. Moreover, they require so large a corporate outlay in permanent and long-lived structures and equipment that capital duplication is economically prohibitive, and consequently adequate service is virtually unobtainable by the public through the ordinary channels of private competitive business.

We find nothing in the Fourth to Eighth Class County Assessment Law that indicates any intention on the part of the legislature to make a fundamental change in the law. Its language does not materially differ from that used in prior acts under which the term "real estate" has on every occasion been held not to include the property of quasi-public corporations, and we must therefore presume that the legislature intended the same construction to be placed upon it: Statutory Construction Act of May 28, 1937, P. L. 1019, article IV, sec. 52, 46 PS §552(4).

That plaintiff is indeed a quasi-public corporation cannot well be doubted. Its public character as an agency of interstate commerce is established by the Act of Congress of June 21, 1938, c. 556, sec. 1, 52 Stat. at L. 821, 15 U. S. C. §717, known as the Natural Gas Act, which contains the following declaration:

"As disclosed in reports of the Federal Trade Commission made pursuant to S. Res. 83 (70th Congress, 1st Sess.) and other reports made pursuant to the authority of Congress, it is declared that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest."

Under the Federal law, however, the production and gathering of natural gas, as well as the ultimate distribution to the public, are left to state control; the pipelines are regulated not as public transportation agencies, but as integral parts of vertical utilities.

In this State the legislature long ago declared the transportation and supply of natural gas for public consumption to be a public use and granted to corporations engaged in that business the power of eminent domain: Act of May 29, 1885, P. L. 29, sec. 10, 15 PS §1989, et seq. The grant of the power of eminent domain constitutes in itself official recognition of the vital public interest in the business; such grants cannot be made to private corporations: Appeal of The City of Pittsburgh, 123 Pa. 374; Philadelphia Rural Transit Co. v. Philadelphia et al., 309 Pa. 84. The preamble to the Act of 1885 recites that natural gas had even then become "a prime necessity for use as a fuel and otherwise in the development of trade", and in 1888 our Supreme Court was able to say further:

"It is, moreover, part of the common history of the Commonwealth that the discovery and use of natural gas has facilitated and cheapened and increased the production of manufactured articles of all descriptions where heat is employed in the generation of steam or in the processes of manufacture. By cheapening and increasing production trade has been stimulated, facilitated, and developed wherever the natural gas has been made available as a fuel"; Carothers v. Philadelphia Co., 118 Pa. 468.

Of course, the mere fact that plaintiff does not sell to consumers directly does not in any way diminish the advantages that the public derives from its operations: Franke v. Johnstown Fuel Supply Co., 70 Pa. Superior Ct. 446. To the full extent that the supply of gas for use in the Commonwealth is increased by its opera-

tions the public benefits: Jacobs v. Clearview Water Supply Company, 220 Pa. 388.

For these reasons we think it clear that no local tax can lawfully be imposed upon the plaintiff's pipeline system.

### Conclusions of Law

1. Plaintiff is a quasi-public corporation.

2. The pipelines of plaintiff are not subject to local taxation in this Commonwealth.

3. The action of the Board of Assessment and Revision of Taxes of Fayette County on August 29, 1949, assessing the pipelines of plaintiff for local taxation for the year 1950 is illegal and void.

4. Plaintiff is entitled to a decree enjoining and restraining the County of Fayette, its officers and agents, from collecting or attempting to collect from plaintiff any taxes for the year 1950 by virtue of the assessment of the pipelines of plaintiff by the Board of Assessment and Revision of Taxes on August 29, 1949, or by virtue of any subsequent levy thereon by the commissioners of the county.

### Decree Nisi

And now, August 31, 1951, upon consideration of the foregoing case, it is ordered, adjudged and decreed as follows:

1. That an injunction issue permanently enjoining and restraining the County of Fayette, its offcers and agents, from collecting or attempting to collect from plaintiff any taxes for the year 1950 by virtue of the assessment of the pipelines of plaintiff by the Board of Assessment and Revision of Taxes on August 29, 1949, or by virtue of any subsequent levy thereon by the commissioners of the county.

2. That the County of Fayette pay the costs of this proceeding.

The prothonotary is directed to enter this decree nisi and to give notice of its entry to the parties or their counsel of record, and if no exceptions are filed within 10 days after notice, to enter it as the final decree, as of course.